IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| S.A.H.H. HOSPITAL MANAGEMENT, LLC, S.A.H.H. INVESTMENT GROUP, LTD., S.A.H.H. MANAGEMENT, INC., § § § § *Plaintiffs*, § § v. § § SAN ANTONIO HOSPITAL § MANAGEMENT, INC., SAN ANTONIO § HOLDINGS, INC., and MEDCATH, INC., § § *Defendants*. § | Civil Action No.  SA-12-CV-1069-XR |

**ORDER**

On this day the Court considered Defendants' motion to dismiss. Doc. No. 9. The motion is GRANTED in part and DENIED in part. The motion to dismiss the fraudulent inducement claim is GRANTED. With respect to the claims for breach of contract and breach of fiduciary duty, the motion to dismiss is DENIED.

**I. Background**

**A. Factual & Procedural Background[1]**

Plaintiffs S.A.H.H. Hospital Management, LLC, S.A.H.H. Investment Group, Ltd., and S.A.H.H. Management, Inc. were formed by a group of cardiologists to build a heart hospital in San Antonio ("the hospital"). In 2001, Plaintiffs formed a limited partnership with Defendants San Antonio Hospital Management, Inc. ("SAHMI") and San Antonio Holdings, Inc. ("SAH") to

---

[1] The following factual background summary is predicated on facts alleged in Plaintiffs' Amended Complaint, which the Court must accept as true for the purposes of a 12(b)(6) motion to dismiss.

build and operate the hospital. SAHMI and SAH are both wholly-owned subsidiaries of Defendant Medcath, Inc. ("MedCath").

The hospital partnership did not fare as well financially as expected, and by 2010 Defendants were looking to sell. In August 2010, the parties entered into a Put/Call Agreement. The agreement provided Defendants with the right to purchase Plaintiffs' partnership interests at any time in order to facilitate the sale of the hospital. Defendants exercised their purchase right in December 2010, and the hospital was sold to a third party later that month. Around that time, Defendants informed Plaintiffs that they were under investigation by the federal government for billing practices related to Implantable Cardiac Defibrillators (the "ICD Investigation"). Accordingly, Defendants unilaterally increased the amount of cash held in reserve to pay for future liabilities from $2.5 million to $11 million. Although a reserve fund ("The Reserve") was provided for in the Put/Call Agreement, Plaintiffs allege that Defendants breached the contract by funding the Reserve in a certain way. In addition, Plaintiffs bring claims for fraudulent inducement based upon alleged misconduct surrounding the negotiation of the Put/Call Agreement, as well as for breach of fiduciary duty.

Plaintiffs filed their Original Petition in state court on September 18, 2012. The Original Petition sought $3.3 million in actual damages and $6.6 million in exemplary damages. In addition, Plaintiffs seek an accounting of all proceeds from the sale of the hospital, pre- and post-judgment interest, costs, and attorneys' fees. Defendants timely removed the action to this Court on November 9, 2012, based on diversity jurisdiction. Plaintiffs filed a motion to remand contending that Defendants' notice of removal failed to establish the citizenship of the parties. The Court permitted the parties to conduct discovery related to jurisdictional issues and after

further briefing the Court found that it had subject matter jurisdiction over this case. Doc. No. 29. On July 31, 2013, Defendants' filed this motion to dismiss. Doc. No. 33.

**B. The Put/Call Agreement**

Article II of the Put/Call Agreement defines Defendant SAHMI's call right and is largely the focus of this dispute. The contract permits the General Partner to purchase the interests held by the physician partners. Section 2.1(b) provides the method for calculating the purchase price ("Call Purchase Price"). The price was set at the greater of either: (1) the Plaintiffs' proportionate share of the "Net Proceeds" less certain costs, or (2) $4.48 million less certain costs (the "Call Floor Price"). Section 2.1(c) defines "Net Proceeds" to include both: (1) all cash proceeds from the sale, and (2) "Accounts Receivable" during the year following the sale closing date.

Section 2.1(d) outlines procedures for payment of the Call Purchase Price, and by its terms applies regardless of how the Call Purchase Price is determined under § 2.1(b). Specifically, § 2.1(d) provides that the physicians were entitled to a First Payment on the date of the Asset Sale equal to their share of the net cash proceeds, less their proportionate share of: (1) all known liabilities, and (2) the Reserve fund. This Reserve was initially set at $2.5 million, but could be increased or decreased by Defendants "upon the Asset Sale Closing only if the General Partner has a good faith basis to do so." Put/Call Agreement § 2(d)(i)(y). Finally, §2.1(d) provides that "in no event shall the First Payment be less than the Call Floor Amount," and that the physicians would be entitled to additional payments if the final Call Purchase Price exceeded the First Payment. In that case, the Put/Call Agreement stipulates that the physicians were to be

paid out of the Accounts Receivable, unless that asset had been sold to the potential buyer. Put/Call Agreement §2.1(d)(ii-iv).

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While detailed factual allegations are not necessary, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. However, a complaint can survive a motion to dismiss even if actual proof of the facts alleged is "improbable." *Twombly*, 550 U.S. at 556. Although the court must take all of the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

In deciding a motion to dismiss, a court may consider documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 388 (5th Cir. 2010). In this breach of contract case, the contract itself is incorporated into the complaint by

reference. Accordingly, it is appropriate for this Court to consider the Put/Call Agreement when addressing this motion to dismiss.

## III. Discussion

### A. The Breach of Contract Claim[2]

Plaintiffs articulate two theories of how Defendants allegedly breached the contract. First, they allege that the Put/Call Agreement prohibited the Defendants from using $3.3 million from the SAHH physicians' Accounts Receivable to fund an $8.5 million increase in the Reserve. Second, Plaintiffs claim that the Defendants did not have a "good faith basis" for increasing the Reserve as is required by the Put/Call Agreement.

Resolution of both questions requires the Court to construe the terms of the Put/Call Agreement. The parties agree that Texas law governs this contract. "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex. 1996) (citing *National Union Fire Ins. Co. v. CBI Industries, Inc*., 907 S.W.2d 517, 520 (Tex. 1995). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *CBI*, 907 S.W.2d at 520; *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex. 2001). When a court construes a contract, it seeks to determine the parties' true intent as expressed in the document. *Lenape Res. Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex. 1996); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To do so, courts look at the contract as a whole and do not read provisions in such an isolated manner as to render them meaningless. *Coker*, 650 S.W.2d at 393. It is

---

[2] The contract dispute turns on the terms of payment. The parties agree that Defendant San Antonio Holdings, Inc. does not have a payment obligation under the contract. The Put/Call Agreement makes the General Partner (SAHMI) primarily liable for payments to the Plaintiffs. Medcath serves as the guarantor of this obligation.

appropriate to construe contracts from a utilitarian standpoint, keeping in mind the relevant business goals of the parties. *Lenape Res.*, 925 S.W.2d at 574.

1. *Did the Agreement Permit Defendants to Fund the Increase with Accounts Receivable?*

Contrary to Defendants' assertions, Plaintiffs are not arguing that the Put/Call Agreement categorically prohibits the General Partner from increasing the Reserve. Doc. No. 33 at 7. The precise allegation is that the General Partner had no authority under the agreement to use the Accounts Receivable to fund any increase to the Reserve. This is an important distinction, because it is clear from the terms of the Put/Call Agreement that the General Partner has the overall authority to increase the Reserve. The agreement provides in pertinent part that the Reserve "may be increased or decreased by the General Partner." Put/Call Agreement § 2.1(d)(i)(y).

Section 2.1(d)(1)(y) establishes the Reserve but does not expressly state how increases to it should be funded. Defendants argue that, given the text and structure of the contract, they were justified in using the Accounts Receivable to fund the Reserve. Doc. No. 33. In contrast, Plaintiffs argue that "nowhere does the Put/Call Agreement permit the Defendants to use the Accounts Receivable to fund a contingency reserve." Doc. No. 34 at 6-7 (emphasis omitted). In the alternative, Plaintiffs argue that the contract is ambiguous. Doc. No. 34. An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994); *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 727 (Tex. 1981). For an ambiguity to exist, both interpretations must be reasonable. *New Ulm*, 940 S.W.2d at 588.

Plaintiffs have sufficiently alleged that the Defendants failed to follow the payment procedures outlined in the contract. Section 2.1(d) establishes that Defendants were obligated to pay Plaintiffs the Call Purchase Price. Section 2.1(d)(i) stipulates that a "First Payment" became due on the "date of the Asset Sale Closing." *Id.* This payment was to be calculated as Plaintiffs' share of net proceeds from the sale, minus: (1) costs, (2) Plaintiffs' share of known obligations and liabilities and (3) Plaintiffs' proportionate share of the Reserve. Therefore, the contract is clear that Plaintiffs' share of the Reserve fund was to be subtracted from the First Payment on the date of the asset sale closing. As Plaintiffs note, there is no similar text in the contract granting Defendants the authority to withhold Plaintiffs' portion of the Reserve from subsequent payments from the Accounts Receivable.

The structure of the contract implies that the signatories did not intend for the Accounts Receivable to fund Plaintiffs' share of the Reserve. Under the terms of the agreement, the physician partners were entitled to additional payments if the Call Purchase Price exceeded the First Payment. Put/Call Agreement § 2.1(d)(i). These payments were to come from the Accounts Receivable, and are addressed in § 2.1(d)(ii-iv). These subsections indicate how the Accounts Receivable would be paid. Notably, while costs and known liabilities were to be withheld from payment of the Accounts Receivable, there is no mention of the General Partner's authority to withhold the Reserve from these payments. This is in contrast to § 2.1(d)(i), which expressly states that the Reserve is to be withheld from the First Payment. The implication by omission is that the parties did not intend for the Reserve funds to be withheld from the Accounts Receivable.

Plaintiffs allege that Defendants did not pay the Call Purchase Price in the manner proscribed by § 2.1(d). Defendants allegedly declined withholding Plaintiffs' portion of the Reserve from the First Payment, and instead deferred collection by withholding future payments of Accounts Receivable. Am. Compl. ¶27. Since the contract states that the Reserve must be withheld on the date of the asset sale closing, Defendants' alleged act of delaying this withholding until a later date, if true, constitutes a breach of the contract.

This interpretation begs the question of how Plaintiffs were harmed by Defendants' choice to delay withholding their portion of the Reserve. Plaintiffs suggest that Defendants did this so that they could get $3.3 million into the Reserve without having the First Payment fall below the Call Floor Price. *Id.* In other words, had Defendants subtracted the $3.3 million from the net proceeds, they would not have had enough cash from the sale to cover the Call Floor Price. As Defendants themselves note, this contract was intended to distribute the risks and rewards from the sale of the partnership. Defendants appear to have been chiefly responsible for negotiating sale of the partnership. The market apparently did not allow Defendants to obtain a final sale price that would allow them to both cover the Call Floor Price and increase the Reserve to their desired level. By carefully and deliberately structuring the terms of payment, the contract seems to allocate the risk that this might occur to the Defendants. Plaintiffs have stated a claim for breach of contract based on Defendants' alleged failure to follow the provisions for payment set forth therein.

2. *Did Defendants have a "Good Faith Basis" for Increasing the Reserve?*

Plaintiffs allege that the Defendants breached the Put/Call Agreement by failing to increase the Reserve in good faith as expressly required by the contract. Section 2.1(d)(i)(y)

8

provides that "any increase . . . may occur upon the Asset Sale only if the General Partner has a *good faith basis to do so*, such as an unanticipated claim for reimbursement under any government program, employee claims, legal actions filed or threatened." *Id.* (emphasis added). Plaintiffs' theory is that the Defendants increased the Reserve not only to protect the partnership against future liability, but also to increase their share of the sale proceeds. Am. Compl. ¶ 24. Plaintiffs allege that the Agreement "permits Reserves for only 'unanticipated claim(s).'" Doc. No. 34 at 10 (quoting Put/Call Agreement §2.1(d)(i)(y)). Since the Defendants allegedly knew about the ongoing ICD investigation, the claim could not have been "unanticipated" by definition. Therefore, Plaintiffs argue that the Defendants breached the contract by increasing the Reserve to address an "anticipated claim."

Defendants counter with the observation that the phrase "such as" modifies "unanticipated claim(s)," and that this language indicates that unanticipated claims cannot be the only good faith bases for increasing the Reserve. Doc. No. 38. On one hand, the Court agrees with the Defendants that the "such as" language precludes Plaintiffs' restrictive reading that *only* an unanticipated claim can count as a good faith basis for an increase to the Reserve. On the other hand, the "such as" language also suggests that the drafters of the contract had unanticipated claims in mind when they created the Reserve. This is further evident when subsection (y) is read in conjunction with subsection (x). It is apparent that the two provisions work together to allocate the risk to the parties that the income from sale of the partnership will be diminished by some future liability. Subsection (x) expressly deals with known "liabilities and obligations." Since liabilities can only be known or unknown, the implication is that subsection (y) was intended to be focused on unknown (or unanticipated) costs. Therefore, the

fact that the stated justification for the increase was alleged to have been "anticipated" weighs against it being a good faith basis for an increase.

The Reserve was initially set at $2.5 million, a figure aligned with what the Defendants allegedly represented to be the partnership's liabilities as of July 2010. Plaintiffs allege that the Defendants knew about the ICD investigation at that time and, consequently, were on notice that the Reserve fund would have to be adjusted upwards to account for the additional liability. Nevertheless, Defendants allegedly set the Reserve artificially low with full knowledge that they would later spring an increase on the Plaintiffs. It is under these circumstances that Plaintiffs allege that the increase was not made in good faith.

Perhaps most importantly, Plaintiffs also allege that the amount of the increase was "far more than the amount of any reasonable assessment of liability." Am. Compl. ¶24. At the motion to dismiss stage, the Court assumes that this allegation is true. The purpose of the Reserve was to establish a contingency fund for future costs. If the increase went beyond what was necessary for that purpose, then it was likely not made in good faith. The Put/Call Agreement gives the General Partner discretion to increase the Reserve. The "good faith basis" requirement was presumably intended to protect the Plaintiffs from arbitrary uses of the General Partner's discretion. For the good faith requirement to have any meaning, it must protect Plaintiffs against unreasonably large increases to the Reserve. By alleging that the amount of the increase far exceeded what was necessary, Plaintiffs have sufficiently pled that the Defendants did not have a good faith basis for the increase. As a result, Plaintiffs have stated a claim that the Defendants have breached the Put/Call Agreement.

B. **The Fraudulent Inducement Claim**

Plaintiffs also allege that they were fraudulently induced to enter into the Put/Call Agreement. Am. Compl. ¶ 36. Plaintiffs' theory is that the Defendants' failure to disclose the ICD investigation constituted a fraud by omission. Fraud by omission is a "subcategory of fraud because the omission or non-disclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose." *Manon v. Solis*, 142 S.W.3d 380, 387 (Tex.App. — Houston [14th Dist.] 2004, pet. denied). To establish fraud by omission, a plaintiff must prove: "(1) the defendant failed to disclose facts to the plaintiff when the defendant had a duty to disclose such facts; (2) the facts were material; (3) the defendant knew of the facts; (4) the defendant knew that the plaintiff was ignorant of the facts and did not have an equal opportunity to discover the truth; (5) the defendant was deliberately silent and failed to disclose the facts with the intent to induce the plaintiff to take some action; (6) the plaintiff relied on the omission or concealment; and (7) the plaintiff suffered injury as a result of acting without knowledge of the undisclosed facts." *Berge Helene Ltd. v. GE Oil & Gas, Inc.*, 896 F. Supp. 2d 582, 618 (S.D. Tex. 2012) (*citing Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998)). In addition, plaintiffs in federal court are required to plead state-law fraud claims with the heightened particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010) (applying Rule 9(b) to Texas law fraud claims).

Plaintiffs have generally satisfied their burden by providing sufficient detail in the Amended Complaint. The Amended Complaint alleges that the material omission occurred on July 20, 2010. On that date, a meeting allegedly occurred between Plaintiffs' representatives and

Defendant MedCath's officers, Art Parker and Ed French. Am. Compl. ¶ 19. At the meeting, Defendants announced their intention to sell their interest in the partnership and encouraged Plaintiffs to sell their interests as well. *Id.* It was during this meeting that Plaintiffs allege that Parker, French, and their consultants failed to disclose their knowledge of the ongoing ICD investigation. *Id.* at ¶ 21.

As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). Thus, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent. *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995); *Smith v. Nat'l Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979). Whether such a duty exists is a question of law. *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633 (Tex. App.—San Antonio 1993, writ denied). Here, Plaintiffs have sufficiently alleged that Defendants had a duty to disclose based on the fiduciary relationship between the parties. Am. Compl. ¶ 40; *McBeth v. Carpenter*, 565 F.3d 171, 179 (5th Cir. 2009) (fiduciary has duty to disclose under Texas law).

Plaintiffs allege that the material omission was the failure to disclose the ongoing ICD investigation. Am. Compl. ¶ 19. Materiality is determined by examining whether a "reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Am. Med. Int'l v. Giurintano*, 821 S.W.2d 331, 338 (Tex.App.—Houston [14th Dist.] 1991, no writ). In this case, the Court is satisfied that the failure to disclose the ICD investigation was material. As evidenced by the subsequent $8.5 million increase in the Reserve, the ICD investigation entailed a significant

amount of potential liability for the partnership.  By failing to disclose this potential liability, Defendants were able to inflate their estimate of how much Plaintiffs could expect to receive from any potential sale.  The Court finds that a "reasonable person" would want to know about a government investigation when setting up a fund to deal with contingent liabilities.  Plaintiffs suffered harm from this omission, because Defendants later used the existence of the ICD investigation to justify increasing the Reserve, a fact that is alleged to have decreased Plaintiffs' profits from the transaction.

Although Plaintiffs come close to meeting their burden of pleading the elements of fraud with particularity, the Amended Complaint does not sufficiently allege that Plaintiffs relied on Defendants' omission.  To succeed in a common law fraud action, a plaintiff's reliance on the defendant's fraudulent conduct must be justifiable as well as actual.  *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1025 (5th Cir. 1990).  In pertinent part, the Amended Complaint reads: "Defendant's fraudulent conduct was relied on by plaintiffs." Am. Compl. ¶ 37.  Without further factual support, this is a conclusory allegation.  Plaintiffs seek to recover for fraudulent inducement, but have not alleged how the omission of the material fact (that the partnership was under investigation) impacted their decision to agree to the Put/Call Agreement.  Notably, Plaintiffs do not allege that they would not have entered into the Put/Call Agreement had they known of the ICD investigation.  In fact, the notion that Plaintiffs relied on the omission is belied by Plaintiffs' own factual allegations.  Plaintiffs assert that "the threat of Defendants' selling out to some unknown party, plus the debt burden on the Limited Partnership, placed great pressure on SAHH to agree to the sale." Am. Compl. ¶ 20.  Plaintiffs therefore provide alternate reasons why they were "induced" to enter into the contract that are distinct from the alleged fraudulent

omissions. The Amended Complaint lacks any allegation that the omission played any role in Plaintiffs' decision to enter into the contract. Therefore, Plaintiffs have not sufficiently pled that they relied on the material omission to their detriment. Plaintiffs are granted leave to amend to allege factual support for the proposition that they relied on Defendants' alleged material omissions.

Defendants also claim that the Plaintiffs disclaimed any reliance in the contract.[3] Doc. No. 33 at 16. Specifically, Defendants cite to §5.12 of the Put/Call Agreement in which the parties agreed that "no oral prior written statement not specifically incorporated herein shall be of any force and effect." *Id.* The Fifth Circuit has held that Texas law permits a party to disclaim reliance in a contract. *Prime Income Mgmt. v. One Dallas Ctr. Assocs. LP*, 358 F.App'x 569, 572 (5th Cir. 2009). To the extent that §5.12 is effective in disclaiming reliance on prior written and oral statements, by its own terms it does not disclaim reliance on prior omissions. The Texas Supreme Court held that to disclaim reliance in a "standard merger clause," a party must do so by "clear and unequivocal language." *Italian Cowboy Partners, Ltd. v. Prudential Insurance Co.*, 341 S.W.3d 323, 331 (Tex. 2011). Moreover, the Court sees no reason why it should construe §5.12 broadly to preclude fraudulent omission claims. The case law analyzing waiver of reliance provisions appears exclusively focused on contractual provisions that disclaim reliance on affirmative representations, not omissions. *See, e.g. Shlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997) (enforcing a waiver of reliance provision upon a showing that it was the parties' "clear intent" to disclaim reliance).

In *Forrest Oil Corp. v. McAllen*, 268 S.W. 3d 51 (Tex. 2008), the Texas Supreme Court identified five factors for when a disclaimer of reliance could be considered effective. Most

---

[3] Although the fraudulent inducement claim had been dismissed, the Court will address these arguments now because leave to amend has been granted.

relevant to this case, Texas law requires that for such a disclaimer of reliance to be effective, the parties must have "specifically discussed the issue which has become the subject of the subsequent dispute." *Id.* at 60. Defendants attempt to classify the "subject of the subsequent dispute" as the general payment scheme, something that was undoubtedly discussed between the parties. This definition is overly broad. The instant dispute centers on allegations that Defendants did not disclose their knowledge of the ICD investigation. Since the ICD investigation was never discussed, under *McAllen* it is inappropriate for this Court to rule that Plaintiffs have disclaimed reliance in this case.

### C. The Breach of Fiduciary Duty Claim

To state a claim for a breach of fiduciary duty, a plaintiff must show: (1) that a fiduciary relationship existed, (2) a breach of that duty by the defendants; and (3) an injury to plaintiff or a benefit to the defendant as a result of the breach. *Lundy v. Masson*, 260 S.W. 3d 482, 501 (Tex. App—Houston [14th District] 2008, pet. denied). A fiduciary duty requires the fiduciary to place the interest of the other party before his or her own. *Id.* Thus, where a fiduciary relationship exists, the burden is upon the fiduciary to show he acted fairly and informed the other party of all material facts relating to the challenged transaction. *Brazosport Bank v. Oak Park Townhouses*, 889 S.W.2d 676, 684 (Tex.App.—Houston [14th Dist.] 1994, writ denied).

Here, Plaintiffs have sufficiently alleged that a fiduciary relationship exists between the parties. Am. Compl. ¶40. It is settled that a general partner owes fiduciary duties to its limited partners. *Hughes v. St. David's Support Corp.*, 944 S.W.2d 423, 425 (Tex.App.—Austin, 1997, writ denied). Plaintiffs have also sufficiently alleged a breach of that fiduciary duty. First, Plaintiffs have alleged that the Defendants breached the Put/Call Agreement. Second, Plaintiffs

have alleged that Defendants breached their fiduciary duty by failing to disclose their knowledge of the ICD investigation. Under Texas law, a fiduciary has a duty to disclose information. *McBeth v. Carpenter*, 565 F.3d 171, 179 (5th Cir. 2009). Finally, Plaintiffs have alleged that they suffered at least $3.3 million in damages resulting from this breach. Accordingly, Plaintiffs have stated a claim for a breach of fiduciary duties.

## IV. Conclusion

In light of the foregoing analysis, the motion to dismiss the claim for breach of contract and the claim for breach of fiduciary duty is DENIED. However, the motion to dismiss is GRANTED with respect to the claim for fraudulent inducement. Plaintiffs are granted leave to amend that portion of the Amended Complaint.

SIGNED this 22nd day of October, 2013.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE